## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 14-09379 MMM (AJWx) | Date | December 8, 2014 |

| | |
|---|---|
| Title | *Esquire Properties Trading, Inc. v. Starmax Enterprises, Inc., et al.* |

Present: The Honorable    MARGARET M. MORROW

| ANEL HUERTA | N/A |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| None | None |

Proceedings:        **Order Re: Plaintiff's *Ex Parte* Application for Sealing of Complaint, Temporary Restraining Order, Seizure Order, and Order to Show Cause re Preliminary Injunction, and Request for Expedited Discovery**

## I. INTRODUCTION AND BACKGROUND

On December 5, 2014, plaintiff Esquire Properties Trading, Inc. ("EPT") lodged the complaint in this action temporarily under seal.  The complaint names Starmax Enterprises, Inc. ("Starmax"), US Global Import, Inc. ("US Global"), and various fictitious parties (collectively, "defendants") as defendants.[1]  The same day, EPT also lodged under seal an *ex parte* application for a temporary restraining order, seizure order, and order to show cause regarding the issuance of a preliminary injunction,[2] as well as memoranda and various declarations in support of the application.[3]

---

[1] Complaint, Docket No. __ (Dec. 5, 2014) at 1.

[2] Plaintiff's *Ex Parte* Application for a Temporary Restraining Order, Seizure Order, and Order to Show Cause for Preliminary Injunction ("Application"), Docket No. __ (Dec. 5, 2014).

[3] See Memorandum of Points and Authorities in Support of Plaintiff's *Ex Parte* Application for a Temporary Restraining Order, Seizure Order, and Order to Show Cause for Preliminary Injunction ("Memorandum"), Docket No. __ (Dec. 5, 2014); Declaration of Henry Chuang in Support of *Ex Parte* Application for a Temporary Restraining Order, Seizure Order, and Order to Show Cause for Preliminary Injunction ("Chuang Decl."), Docket No. __ (Dec. 5, 2014); Declaration of Bin Li, Esq. In Support of *Ex Parte* Application for a Temporary Restraining Order, Seizure Order, and Order to Show

A.      **Facts Alleged in the Complaint**

EPT is engaged in the business of selling electronic cigarettes, electronic cigars, "cartomizers," which are empty electronic cigarette refill cartridges sold empty combined with atomizers,[4] and smokeless cigarette vaporizer pipes (collectively, "e-cigarette products").[5]  Since 2011, EPT has purportedly advertised and sold e-cigarette products at trade shows, in retail stores, and on the Internet.[6]  EPT allegedly sources its e-cigarette products from original equipment manufacturers ("OEMs") located overseas.  It packages, markets, sells, and distributes the products under four federally-registered trademarks.[7]

Defendants are corporations whose principal places of business are at 406 East 4th Street, Los Angeles, California 90013.[8]  Starmax conducts business as "Starmax Cash and Carry" and "Hookah King"; it operates from physical retail locations at 404 East 4th Street, Los Angeles, California 90013 and 408 East 4th Street, Los Angeles, California 90013, respectively.[9]  Both Starmax and Global conduct e-commerce business via the website www.usglobalimports.com.[10]

EPT alleges that, since March 2014, defendants have sold counterfeit e-cigarette products using

_____

Cause for Preliminary Injunction and Application ("Li Decl."), Docket No. ___ (Dec. 5, 2014); Declaration of Bryan Nguyen in Support of *Ex Parte* Application for a Temporary Restraining Order, Seizure Order, and Order to Show Cause for Preliminary Injunction ("Nguyen Decl."), Docket No. __ (Dec. 5, 2014).

[4]An atomizer is a component of an electronic cigarette which employs a heating element to vaporize a flavored solution called e-liquid for inhalation into the lungs, which may contain nicotine. (See Complaint, ¶ 17, n. 2.)

[5]Complaint, ¶ 17.

[6]*Id.*

[7]*Id.*  EPT alleges that it sells e-cigarette products under the "BOOM," "CLOUPOR," and "CLOUTANK" trademarks.  (*Id.*)  The BOOM mark is owned by EPT and includes two federal trademark registrations from the United States Patent and Trademark Office ("USPTO"): USPTO Registration No. 4,581,825 for the BOOM word mark and USPTO Registration No. 4,617,311 for the BOOM design mark.  (*Id.*, ¶¶ 17-19.)  The CLOUPOR trademark, USPTO Registration No. 4,525,964, and CLOUTANK trademark, USPTO Registration No. 4,525,965, are owned by Shenzen Cloupor Technology Co., Ltd., which has granted EPT exclusive rights to use and enforce the trademarks in the United States.  (*Id.*)

[8]*Id.*, ¶¶ 10-11.

[9]*Id.*

[10]*Id.*

the BOOM, CLOUPOR, and CLOUTANK trademarks; they purportedly package the counterfeit e-cigarettes in containers using the BOOM trade dress.  The products are sold on the website and in Starmax's physical retail locations.[11]  Defendants sell the allegedly counterfeit goods at prices substantially lower than the price of EPT's genuine products.  Based on several customer complaints it has received, EPT alleges that defendants' e-cigarette products are made of inferior materials as compared with genuine EPT goods.[12]

### B.     Evidence Adduced by EPT

In support of its *ex parte* application for a temporary restraining order, seizure order, and order to show cause regarding the issuance of a preliminary injunction, EPT proffers the declarations of its attorney, Bin Li; its President and Chief Executive Officer, Henry Chuang; and a sales manager at EPT, Bryan Nguy.  Chuang states that he first learned defendants were offering allegedly counterfeit EPT e-cigarette products in March 2014 when a customer informed him that Starmax was selling counterfeit CLOUPOUR CLOUTANK "M3" atomizers and BOOM "Reload 3-in-1" products for sale.[13]  Following confirmation from the USPTO that its federal trademark registration applications had been approved, Chuang directed Nguy to go to defendants' retail locations and purchase samples of the counterfeit products.[14]

Nguy states that, on July 7, 2014, he went to defendants' "Starmax Cash & Carry" and "Hookah King" stores and stated that he was interested in purchasing a BOOM Reload 3-in-1 vaporizer set.[15]  Nguy was purportedly shown a genuine BOOM e-cigarette product; when he confirmed that he wished to purchase the product, he was given three BOOM Reload 3-in-1 vaporizer sets that appeared different than the genuine sample he had been shown.[16]  Nguy states that when he inquired about the products he had received, a staff member at the shop represented that the product was the same, but that the packaging had changed.[17]  Nguy took the products to Chuang, who examined them.[18]  Chuang states that the products looked almost identical to genuine BOOM products; he noticed three differences, however: (1) the textured portion of the cartomizer was different than an authentic cartomizer; (2) the font on the vaporizer was different from that used on the authentic product; and (3) the e-cigarette products

---

[11]*Id.*, ¶¶ 22-30.

[12]*Id.*, ¶ 31.

[13]Chuang Decl., ¶ 6.

[14]*Id.*, ¶¶ 7-8.

[15]Nguy Decl., ¶¶ 5-6.

[16]*Id.*

[17]*Id.*

[18]Chuang Decl., ¶¶ 8-10.

purchased from defendants did not authentication numbers affixed as all authentic products do.[19] Chuang took defendants' products with him on a site visit to EPT's exclusive OEM. The OEM inspected them and confirmed that it was not the source of defendants' products.[20]

On October 1, 2014, Nguy visited defendants' retail stores again to purchase additional e-cigarette products.[21] He purchased ten units of BOOM Reload 3-in-1 vaporizer sets and ten units of CLOUPOR CLOUTANK M3 atomizers.[22] Chuang inspected the goods after they were delivered by Nguy and confirmed that they were not authentic; he found the same distinguishing details he observed in the products Nguy had purchased earlier.[23] On October 27, 2014, after learning that defendants sold e-cigarette products on their website, Chuang ordered four units of BOOM Reload 3-in-1 vaporizers and four units of CLOUPOR CLOUTANK M3 vaporizers.[24] He received the products – shipped from 406 E. 4th Street, Los Angeles, California 90013 – on October 30, 2014, and confirmed that they were counterfeit.[25]

EPT also investigated defendants' pricing of BOOM and CLOUPOR CLOUTANK products. EPT sells BOOM 3-in-1 vaporizers to the general public for $60, to retail vendors for $30, and to wholesale distributors for $22.[26] In contrast, defendants sell the allegedly counterfeit BOOM products to the general public for $25 and to licensed retailers for $18.[27] EPT sells CLOUPOR CLOUTANK M3 atomizers to the general public for $19.99, to retail vendors for $10-12, and to wholesale distributors for $7-8.[28] Defendants sell CLOUPOR CLOUTANK M3 atomizers to the general public for $7.50.[29]

Based on these facts, EPT seeks a temporary restraining order restraining defendants from: (1) using counterfeit reproductions of the BOOM, CLOUPOR, and CLOUTANK trademarks in connection,

---

[19]*Id.*, ¶ 9.

[20]*Id.*, ¶ 11.

[21]Nguy Decl., ¶ 7.

[22]*Id.*

[23]Chuang Decl., ¶ 12.

[24]*Id.*, ¶ 14.

[25]*Id.*, ¶ 15.

[26]Chuang Decl., ¶ 17.

[27]*Id.*, ¶ 19.

[28]*Id.*, ¶ 18.

[29]*Id.*, ¶ 19.

*inter alia*, with the advertising and sale of counterfeit e-cigarette products bearing those marks; (2) making commercial use of EPT's BOOM, CLOUPOR, and CLOUTANK trademarks; (3) using any other false designation of origin, description, or representation that is likely to confuse consumers and cause them to believe that defendants' products originate from EPT or are otherwise authorized by it; (4) taking any acts calculated or likely to cause confusion among consumers as to the source of defendants' goods; (5) removing, returning, or otherwise disposing of any counterfeit e-cigarette products or other products that bear EPT's registered trademarks; (6) destroying, altering, removing, or deleting any books, documentation or records – electronic or otherwise – which contain information relating, *inter alia*, to producing, distributing, selling, marketing, and offering unauthorized products bearing EPT's marks for sale; (7) further infringing EPT's marks and goodwill; (8) otherwise competing unfairly with EPT or its authorized distributors and retailers; and (9) assisting, aiding, or abetting any other person or business entity to engage in such activities.[30]

EPT also seeks an *ex parte* order directing the United States Marshal's Service to seize and impound all data, documents, records, and information in defendants' possession at 404, 406, and 408 East 4th Street, Los Angeles, California, 90013 relating to: (1) the identity of other business entities or persons offering counterfeit goods bearing the BOOM, CLOUPOR, and/or CLOUTANK trademarks for sale; (2) the design, manufacture, purchase, importation, distribution, offering for sale and/or sale of products under counterfeit reproductions of EPT's trademarks on usglobalimports.com, including the publicly posted Internet content evidencing offers of counterfeit products bearing EPT's marks for sale; (3) bank account information for Doe defendants; (4) email communications and/or payment records for Doe defendants.[31]

EPT seeks finally to have its counsel, Bin Li, appointed as substitute custodian to take possession of all items seized pursuant to the seizure order; to have the court issue an order to show cause regarding preliminary injunctive relief; and to allow expedited discovery before the preliminary injunction hearing; and to have the court temporarily seal all documents currently filed in this action until after the seizure order has been executed.[32]

## II.  DISCUSSION

### A.   Whether the Court Should Grant EPT's *Ex Parte* Application for Temporary Restraining Order

#### 1.   Legal Standard Governing Issuance of Temporary Restraining Orders

The standard for issuing a temporary restraining order ("TRO") is the same as that for issuing

---

[30]See [PROPOSED] *Ex Parte* Order Granting Plaintiff a Temporary Restraining Order, Seizure Order, and Substitute Custodian Order, Docket No. __ (Dec. 5, 2014) at 5-7.

[31]*Id.* at 7-8.

[32]*Id.* at 8.

a preliminary injunction. *Stuhlbarg Int'l Sales Co. v. John D. Brushy & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001); *Ali v. United States*, 932 F.Supp. 1206, 1208 (N.D. Cal. 1996). A "preliminary injunction is an extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 676 (2008), and a district court should enter preliminary injunctive relief only "upon a clear showing that the plaintiff is entitled to such relief," *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008). Such a showing requires that plaintiff establish it is "likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. See *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) ("Under *Winter*, plaintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest"). See also *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) ("The proper legal standard for preliminary injunctive relief requires a party to demonstrate 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest,'" quoting *Winter*, 555 U.S. at 20); *American Trucking Associations, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits," citing *Winter*, 555 U.S. at 20); *Timbisha Shoshone Tribe v. Kennedy*, 687 F.Supp.2d 1171, 1182 (E.D. Cal. 2009) ("Pursuant to *Winter*, [p]laintiffs must make a clear showing that they are likely to succeed on the merits").

Prior to the Supreme Court's decision in *Winter*, the Ninth Circuit held that to prevail on a motion for preliminary injunction, a plaintiff had to demonstrate:

"either: (1) a likelihood of success on the merits and the *possibility* of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor. These two alternatives represent extremes of a single continuum, rather than two separate tests. Thus, the greater the relative hardship to the party seeking the preliminary injunction, the less probability of success must be shown." *Stormans, Inc.*, 586 F.3d at 1127 (quoting *Clear Channel Outdoor Inc. v. City of L.A.*, 340 F.3d 810, 813 (9th Cir. 2003) (emphasis original)).

The *Winter* Court "definitively refuted" the Ninth Circuit's "possibility of irreparable injury" standard. *Id.* It held that the "'possibility' standard [was] too lenient," and that "plaintiffs seeking preliminary relief [have] to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis original). Following *Winter*, the Ninth Circuit has held that "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *American Trucking Associations*, 559 F.3d at 1052 (footnote omitted).

It has thus articulated an alternate formulation of the sliding scale test. Post-*Winter*, serious questions going to the merits and a balance of hardships that tips sharply in favor of the plaintiff can support issuance of a preliminary injunction if plaintiff also shows that there is a likelihood of irreparable injury and the injunction is in the public interest. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("To the extent prior cases applying the 'serious questions' test have held that a preliminary injunction may issue where the plaintiff shows only that serious questions

going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor, without satisfying the other two prongs, they are superseded by *Winter*, which requires the plaintiff to make a showing on all four prongs. . . . But the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test. That is, 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest").

### 2. Notice Requirements for Temporary Restraining Orders

Rule 65 of the Federal Rules of Civil Procedure sets forth notice requirements for issuance of preliminary injunctions and TROs. See FED.R.CIV.PROC. 65. Rule 65 provides, in relevant part:

> "The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if:
>
> (A)   specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
>
> (B)   the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED.R.CIV.PROC. 65(b)(1).

The United States Supreme Court has explained that the circumstances justifying the issuance of a temporary restraining order on an *ex parte* basis are extremely limited:

> "The stringent restrictions imposed . . . by Rule 65 on the availability of *ex parte* temporary restraining orders reflect the fact that our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute. *Ex parte* temporary restraining orders are no doubt necessary in certain circumstances, but under federal law they should be restricted to serving their underlying purpose of preserving the status quo and preventing irreparable harm just so long as is necessary to hold a hearing, and no longer."

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 438-39 (1974) (citing *Carroll v. President and Commissioners of Princess Anne*, 393 U.S. 175, 180 (1968); *Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n*, 306 F.2d 840 (2d Cir. 1962); *Smotherman v. United States*, 186 F.2d 676 (10th Cir. 1950); *Sims v. Greene*, 161 F.2d 87 (3d Cir. 1947)).

Consistent with the overriding concern articulated by the Supreme Court, the Ninth Circuit has observed that there are "very few" circumstances that justify the *ex parte* issuance of a TRO. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1226, 1131 (9th Cir. 2006). Notice can be excused where it "is impossible [to give notice] either because the identity of the adverse party is unknown or because a known party cannot be located in time for a hearing." *Id.* "Notice may also not be required where providing 'notice to the defendant would render fruitless the further prosecution of the action' because

the adverse party is likely to destroy evidence." *Rovio Entertainment Ltd. v. Royal Plush Toys, Inc.*, 907 F.Supp.2d 1086, 1094 (N.D. Cal. 2012) (citing *Reno Air*, 452 F.3d at 1131); see also *United Tactical Systems, LLC v. Real Action Paintball, Inc.*, No. 14-CV-04050 MEJ, 2014 WL 4979364, *2 (N.D. Cal. Oct. 6, 2014) (citing *Reno Air* and noting that notice is not be required where "the adverse party is likely to destroy evidence" if given notice).

In the trademark infringement context, courts have recognized that the likelihood an alleged infringer will dispose of the infringing goods before a hearing can be held if given notice may justify *ex parte* issuance of a TRO.  See generally *Rovio*, 907 F.Supp.2d at 1094; *Wangson Biotechnology Group, Inc. v. Tan Tan Trading Co., Inc.*, No. C 08-04212 SBA, 2008 WL 4239155, *6 (N.D. Cal. Sept. 11, 2008).  In such cases, "'[p]laintiffs must show that defendants would have disregarded a direct court order and disposed of the goods within the time it would take for a hearing . . . [and] must support such assertions by showing that the adverse party has a history of disposing of evidence or violating court orders or that persons similar to the adverse party have such a history.'"  *Reno Air*, 452 F.3d at 1131 (citing *First Tech. Safety Sys., Inc. v. Depinet*, 11 F.3d 641, 650 (6th Cir. 1993); *Matter of Vuitton et Fils S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979)); see also *Rovio*, 907 F.Supp.2d at 1094 ("[T]he applicant must show that defendants would disregard a court order and dispose of the goods within the time it would take for a hearing and must support such assertions by showing that the adverse party has a history of disposing of evidence or violating court orders or that persons similar to the adverse party have such a history").

### 3.     Whether EPT Has Demonstrated that It Is Entitled to *Ex Parte* Injunctive Relief

As noted, EPT contends that it is entitled to an *ex parte* TRO because it has suffered and will continue to suffer irreparable harm as a result of the fact that "[t]he [c]ounterfeit [g]oods sold and distributed by [d]efendants are nearly identical to [p]laintiff's genuine [e]-[c]igarette [p]roducts."[33]  EPT argues that if a TRO does not issue, defendants will be able to continue to use EPT's trademarks to divert its business to defendants.[34]  EPT also asserts that "the sale of [c]ounterfeit branded [e]-[c]igarette [p]roducts will proliferate, further harming the goodwill associated with [EPT's] marks."[35]

Because EPT seeks issuance of a TRO without notice to defendants, the court must first determine whether this is one of "very few circumstances justifying the issuance of an *ex parte* TRO." *Reno Air*, 452 F.3d at 1131.  If it is, the court can then consider the merits of EPT's application. See, e.g., *Rovio*, 907 F.Supp.2d at 1094-97 (considering whether plaintiff had adduced sufficient evidence to justify *ex parte* issuance of a TRO under *Reno Air* before considering the *Winter* factors); *Wangson Biotechnology Group*, 2008 WL 4239155 at *6 (same).

---

[33]Memorandum at 5.

[34]*Id.*

[35]*Id.* at 2.

EPT has not made a sufficient showing to justify *ex parte* issuance of a TRO.[36]  It argues that such relief is appropriate because "[d]efendants are engaged in counterfeit activities; and, if notice were given, the records and data of counterfeit activity very likely would disappear and thus preclude this [c]ourt from being able to grant effective relief."[37]  In support of this argument, EPT proffers the declaration of its attorney, Bin Li, who states that "[i]n situations of clear infringement and counterfeiting, as in this instance, a plaintiff can seldom secure meaningful relief since the infringing merchandise soon disappears and the true source of such merchandise often is never discovered."[38]  Lin also asserts that notice is not feasible because "counterfeiters invariably conceal or transfer their merchandise when they realize that they are about to be apprehended."[39]  He posits that "[d]efendants in this action can be similarly expected to divest themselves of their inventory of counterfeit merchandise and any relevant business records absent the issuance of [a] temporary restraining [ ] order[ ] without notice" because, "[c]onfronted with the loss of their inventory and a substantial adverse judgment predicated upon the information contained in their business records, [defendants] cannot be expected to produce voluntarily their contraband merchandise and any business records documenting their illegal activities."[40]

This evidence does not "clearly show that immediate and irreparable injury, loss, or damage will result to [EPT] *before the adverse party can be heard in opposition*," as required by the Federal Rules of Civil Procedure for *ex parte* issuance of a TRO.  See FED. R. CIV. PROC. 65(b).  As noted, there are "very few circumstances justifying the issuance of an *ex parte* TRO."  See *Reno Air*, 452 F.3d at 1131 ("[O]ur entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted to both sides of a dispute, quoting *Granny Goose Foods*, 415 U.S. at 439).  Courts have generally confined *ex parte* injunctive relief to two situations: (1) where identity of the adverse party is unknown or a known party cannot be located in time for a hearing; and (2) a "narrow band of cases in which *ex parte* orders are proper because notice to the defendant would render fruitless the further prosecution of the action." *Id.*

EPT has not cited, let alone satisfied, the *Reno Air* standard for issuing a TRO on an *ex parte* basis under Rule 65(b)(1).  Although EPT states that it does not know the identity of certain defendants, it does not assert that the identity of all defendants is unknown or that they cannot be located in time for a hearing.  The complaint identifies Starmax and US Global as defendants, and alleges that they conduct

---

[36]Because the court concludes that EPT has not made a sufficient showing to justify *ex parte* issuance of a TRO, it need not consider whether a TRO is otherwise appropriate based on the *Winter* factors.

[37]Memorandum at 2.

[38]Li Decl., ¶ 4.

[39]*Id.*, ¶ 6.

[40]*Id.*, ¶ 7.

business at 404, 406, and 408 East 4th Street, Los Angeles, California 90013.[41]  It is thus clear that EPT knows the identities of the defendants and also knows where they can be found.

While EPT asserts that an *ex parte* TRO is appropriate because, given their counterfeiting activities, defendants are likely to destroy or hide evidence, it proffers no evidence that defendants have disregarded court orders in the past or attempted to dispose of or hide allegedly infringing goods.  Nor does it proffer any evidence that similarly situated parties have done so beyond the *ipse dixit* assertion of its attorney.  Lin's assertion that all counterfeiters "invariably" destroy evidence or fail to comply with court orders is simply not sufficient to justify *ex parte* relief.  Courts in this circuit routinely deny applications for *ex parte* issuance of a TRO where, as here, plaintiffs fail to proffer evidence that the defendant has a history of destroying evidence or violating court orders.  See, e.g., *Starbuzz Tobacco, Inc. v. Namou*, No. 13-CV-1539 MMA (KSC), 2013 WL 3353851, *4 (S.D. Cal. July 2, 2013) ("However, Plaintiff has not submitted evidence demonstrating that 'notice to the defendant[s] would render fruitless the further prosecution of the action.'  *Reno Air*, 452 F.3d at 1131.  Plaintiff does not cite evidence showing that Defendants would disregard a Court order and dispose of or hide the allegedly infringing goods within the time it would take for a hearing.  For instance, Plaintiff offers no evidence that Defendants have failed to appear in court when required or evidence suggesting that Defendants have a history of disposing of evidence or that other individuals or entities similar (i.e., reasonably comparable) to Defendants have a history of destroying evidence.  Instead, Plaintiff generally argues that 'most infringers who are faced with such clear allegations of infringement and the imminent seizure of property and records are highly likely to destroy evidence in an effort to hide their wrongdoing.'  A declaration by Plaintiff's counsel, Natu Patel, was filed to support this assertion. [See Patel Decl. ¶ 4 ('In my experience, accused infringers served with notice of an application for a temporary restraining order and/or preliminary injunction will attempt to destroy evidence in their possession in an effort to hide their wrongdoing').]. . . .  In sum, the Court finds that Plaintiff's conclusory argument and the statement made by its counsel are insufficient to justify the issuance of a TRO without notice to Defendants"); *Rovio*, 907 F.Supp.2d at 1096-97 ("The evidence offered by Plaintiff in support of its motion is insufficient to obtain *ex parte* relief.  Plaintiff does not cite evidence showing that Defendants would disregard a Court order and dispose of or hide the allegedly infringing goods within the time it would take for a hearing.  For instance, Plaintiff offers no evidence that Defendants have failed to appear in court when required or evidence suggesting that Defendants have a history of disposing of evidence or that other individuals or entities similar (i.e., reasonably comparable) to Defendants have a history of destroying evidence.  Instead, Plaintiff generally asserts that 'the propensity of infringers to conceal [infringing] items if they are given notice of an application for a temporary restraining order or seizure is well-documented.'  Though not specifically cited in connection with this issue, the Court notes that Plaintiff has submitted a declaration from one of its attorneys wherein counsel avers that '[g]iven Defendants' brazen illegal conduct as set forth in the moving affidavit, it is reasonable to conclude that there is a threat that Defendants might dispose of the critical evidence unless seized.'  Counsel further avers that Plaintiff seeks 'extraordinary relief *ex parte* because [his] experience in investigating the Defendants and in other piracy cases (nearly twenty (20) years experience as an intellectual property attorney) has confirmed [his] suspicions that infringing

---

[41]See Complaint, ¶¶ 10-11.

parties often secrete or destroy records revealing the true identity of their upstream supplier(s) if any and the volume of product manufactured purchased or sold.' The Court finds that Plaintiff's conclusory argument and the statements made by its counsel are not evidence and certainly do not link the TRO application to Defendants. See *Reno Air*, 452 F.3d at 1132 (*ex parte* TRO not justified based on statement by counsel that it is a common occurrence for infringers to leave the area and destroy or conceal infringing merchandise at one time famous events such as the 'Reno Air Races' and it is well-recognized in the case law; stating that '[t]his conclusory statement from counsel hardly qualified as evidence and certainly did not link the TRO application to [the defendant].'). The statements made by counsel, without more, are insufficient to justify the issuance of a TRO without notice to Defendants").

EPT cites no authority indicating that the conclusory representation of its attorney regarding the "invariabl[e]" practices of counterfeiters satisfies the standard articulated in *Reno Air*. In fact, the *Reno Air* court held that evidence of the very same kind was insufficient to support *ex parte* issuance of a TRO:

> "Reno Air's TRO application and supporting evidence can be described as thin and barebones at best. The application stated that the TRO 'must issue without notice . . . because of the significant risk that Defendant may leave the Reno/Stead Airport area and destroy or conceal [his] infringing merchandise once [he] receive[s] notice of the lawsuit.' The only 'evidence' offered to support this assertion was a declaration from Reno Air's counsel that '[i]n his experience, this is a common occurrence when dealing with infringers at one time famous events such as the 'Reno Air Races' and it is well-recognized in the case law.' This conclusory statement from counsel hardly qualified as evidence and certainly did not link the TRO application to McCord. McCord was no stranger to Reno Air. Curiously, Reno Air did not advise the court of its prior dealings with McCord regarding purported trademark infringement. Nor did the company acknowledge that it had done nothing to enforce its rights following the earlier contacts. Finally, Reno Air offered no support that there was a 'significant risk' that McCord, who had been working in the Reno area for many years, 'may leave the Reno/Stead Airport area.' Were a single conclusory statement by counsel about infringers sufficient to meet the dictates of Rule 65, then *ex parte* orders without notice would be the norm and this practice would essentially gut Rule 65's notice requirements." *Reno Air*, 452 F.3d at 1131-32.

To the extent, therefore, that EPT asserts its contention that defendants are likely to destroy the counterfeit e-cigarette products is alone sufficient to satisfy *Reno Air*, the court is not persuaded. See *Rovio*, 907 F.Supp.2d at 1097 ("Nor is the Court persuaded that *ex parte* relief is appropriate based on Plaintiff's contention that Defendants are likely to 'destroy, conceal or transfer their infringing goods and records relating to these goods if they are given notice' because they have continued to import and sell infringing products after they had goods seized by the United States Customs, and because they have taken deliberate steps to conceal their infringing business activities, including shipping goods to Defendant Park's home and keeping their business doors closed to the general public. Plaintiff did not present any authority or persuasive legal analysis demonstrating that such conduct is sufficient to meet

the *Reno Air* standard for issuing a TRO under Rule 65(b)(1)").

Finally, in addition to these evidentiary shortcomings, EPT's delay in seeking a TRO militates against granting relief. A plaintiff that is faced with a threat of actual and immediate irreparable harm typically seeks a TRO as quickly as possible. See, e.g., *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1091 (9th Cir.2007) (zero days delay); *Lands Council v. Martin*, 479 F.3d 636, 638–39 (9th Cir. 2007) (one day delay); *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1155–1156 (9th Cir. 2006) (ten day delay); *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S.D.A.*, 415 F.3d 1078, 1089 (9th Cir. 2005) (six day delay); *Duke Energy Trading and Mktg., L.L.C. v. Davis*, 267 F.3d 1042, 1048 (9th Cir. 2001) (two day delay). Although EPT first learned of defendants' counterfeiting activities in March 2014, and first confirmed them through a purchase in July, it did not file suit until December 5, 2014. Such a substantial delay weighs against issuance of an *ex parte* TRO. See, e.g., *Rovio*, 907 F.Supp.2d at 1097 (noting that a delay of nearly seventh months in filing an *ex parte* application weighed against issuance of an *ex parte* TRO); *Wangson Biotechnology Group*, 2008 WL 4239155 at *6 (noting that a delay of two months in filing an *ex parte* application weighed against issuance of an *ex parte* TRO).

In sum, apart from the conclusory and unsupported assertion of its counsel, EPT has failed to adduce any evidence justifying *ex parte* issuance of a TRO under Rule 65. The court thus denies EPT's application for an *ex parte* TRO.[42]

### C.     Whether the Court Should Grant EPT's *Ex Parte* Application for a Seizure Order

#### 1.     Legal Standard for *Ex Parte* Seizure Orders

Under 15 U.S.C. § 1116(d)(1)(A), in counterfeit trademark cases arising under 15 U.S.C. § 1114(1)(a), a court can issue an *ex parte* injunction "providing for the seizure of goods and counterfeit marks involved in such violation and the means of making such marks, and records documenting the manufacture, sale, or receipt of things involved in such violation." 15 U.S.C. § 1116(d) (1)(A); *Vuitton v. White*, 945 F.2d 569, 572 (3d Cir. 1991). "The purpose of the *ex parte* seizure provision is to provide victims of trademark counterfeiting with a means of ensuring that the courts are able to exercise their jurisdiction effectively in counterfeiting cases." *Vuitton*, 945 F.2d at 575 (quoting Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. H12076, H12080 (1984)). The courts are to issue

---

[42]Because it denies EPT's application for a temporary restraining order, it also denies its application for an order to show cause why a preliminary injunction should not issue. See, e.g., *Digital Communications Network, Inc. v. AB Cellular Holding LLC*, No. 99-5418 CM (AJWx), 1999 WL 1044234, *2 (C.D. Cal. Aug. 19, 1999) (denying a party's application for both a temporary restraining order and an order to show cause regarding issuance of a preliminary injunction); *Fowler v. United States*, 258 F.Supp. 638, 643 (C.D. Cal. 1966) (declining to issue either a temporary restraining order or an order to show cause regarding issuance of a preliminary injunction). In light of EPT's delay in seeking injunctive relief, the court cannot find that it faces any threat of imminent irreparable harm. Consequently, if EPT seeks injunctive relief, it can file a regularly noticed motion.

such orders only where there is no other means by which to prevent those who deal in counterfeits from destroying or transferring evidence. *Id*. Although Congress created § 1116(d) by borrowing elements from Rule 65, § 1116(d) provides the exclusive procedure for obtaining an *ex parte* seizure order when a party asserts a claim under § 1114(1)(a). See *Vuitton*, 945 F.2d at 572-74.

To obtain an ex parte seizure order, a party must meet a number of requirements . Under § 1116(d)(2), the movant must address whether the local United States attorney has received notice:

> "The court shall not receive an application under this subsection unless the applicant has given such notice of the application as is reasonable under the circumstances to the United States attorney for the judicial district in which such order is sought. Such attorney may participate in the proceedings arising under such application if such proceedings may affect evidence of an offense against the United States. The court may deny such application if the court determines that the public interest in a potential prosecution so requires." 15 U.S.C. § 1116(d)(2).

In addition, the application "shall (A) be based on an affidavit or . . . verified complaint establishing facts sufficient to support the findings of fact and conclusions of law required for such order; and (B) contain the" following information: (1) findings of fact and conclusions of law; (2) a description of the matter to be seized and its location; (3) the seizure date; (4) the security required; and (5) the post-seizure hearing date. 15 U.S.C. §§ 1116(d)(3), (d)(5).

Further, "[t]he court shall not grant such an application unless" the applicant posts such adequate security as the court determines and "the court finds that it clearly appears from specific facts" that: (1) only an *ex parte* seizure order will achieve the purposes of § 1114; (2) the applicant has not publicized the requested seizure; (3) the applicant is likely to succeed in showing the person against whom seizure would be ordered used a counterfeit mark in violation of § 1114; (4) an immediate and irreparable injury will occur if such seizure is not ordered; (5) the matter to be seized will be located at the place identified in the application; (6) the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application; and (7) the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person. 15 U.S.C. § 1116(d)(4); *Vuitton,* 945 F.2d at 574 n. 5.

### 2.    Whether EPT Has Demonstrated that It Is Entitled to an *Ex Parte* Seizure Order

As an initial matter, the court notes that EPT has satisfied each of the prerequisites to requesting an *ex parte* seizure order under § 1116(d). As required by § 1116(d)(2), EPT gave notice of its *ex parte* application to the United States Attorney for the Central District of California on November 25, 2014.[43]

---

[43]See Li Decl., ¶ 11; Exh. 1.

EPT also proffers the sworn declarations of its attorney, its President and CEO, and its sales manager, which set forth the facts underlying its application.[44]  Finally, the proposed order and Li's declaration provide: (1) findings of fact and conclusions of law; (2) a description of the matter to be seized and the addresses where the seizure is to take place; (3) dates for the seizure to take place; (4) the security to be provided by EPT; and (5) dates for the post-seizure hearing.[45]  EPT has thus satisfied the prerequisites set forth in 15 U.S.C. §§ 1116(d)(2), (3), and (5).  The court therefore turns to the merits of EPT's application.

As noted, to issue an *ex parte* seizure order, the court must find that it "clearly appears from specific facts" that: (1) only an *ex parte* seizure order will achieve the purposes of § 1114; (2) the applicant has not publicized the requested seizure; (3) the applicant is likely to succeed in showing the person against whom seizure would be ordered used a counterfeit mark in violation of § 1114; (4) an immediate and irreparable injury will occur if such seizure is not ordered; (5) the matter to be seized will be located at the place identified in the application; (6) the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application; and (7) the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person.  15 U.S.C. § 1116(d)(4).  The court therefore considers the sufficiency of EPT's showing on each of these elements below.

        **a.    Whether Only an *Ex Parte* Seizure Order Will Achieve the Purposes of § 1114 And Whether Defendants, or Persons Acting in Concert with Them, Would Destroy, Move, Hide, or Otherwise Make the Products Inaccessible to the Court If EPT Were Required to Provide Notice of the Seizure**

EPT asserts that only an *ex parte* seizure order will achieve the purposes of § 1114 because "[i]t is common knowledge that counterfeiters will invariably attempt to conceal or destroy any relevant business records and transfer or destroy inventory once they learn they are about to be apprehended."[46] In situations such as this, where a plaintiff premises its showing under § 1116(d)(4)(i) on a contention that the defendant would destroy, move, hide, or otherwise make the matter to be seized inaccessible to the court if notice were given, courts have analyzed a plaintiff's showing under §§ 1116(d)(4)(i) and (vii) together.  See, e.g., *Tommy Hilfiger Licensing, Inc. v. Tee's Ave., Inc.*, 924 F.Supp. 17, 20 (S.D.N.Y. 1996) ("In regard to paragraphs (i) and (vii) the Court finds that an order, other than an *ex parte* order, would not have been adequate to stop the infringement of Plaintiffs' trademarks by the alleged infringers because once notice was given, it is alleged that the infringers would destroy or hid

---

[44]See generally Li Decl.; Chuang Decl.; Nguy Decl.

[45]See [Proposed] *Ex Parte* Order Granting Plaintiff a Temporary Restraining Order, Seizure Order, and Substitute Custodian Order at 2-8; Li Decl., ¶¶ 13-14.

[46]Memorandum at 12.

the counterfeit evidence").

As respects counterfeiters, EPT states:

"Restraining orders have proven largely ineffectual. Counterfeiters exhibit the same disregard for court orders as they do for the intellectual property rights of others. The ease and speed with which data can be destroyed from a computer makes it more critical for the [p]laintiff to obtain the requested *ex parte* seizure order.

The issuance of a seizure order absent notice is crucial to protect [p]laintiff's interests. Without such seizure order, the [d]efendants similarly can be expected to secrete, conceal, destroy, or otherwise divest themselves of records and data of counterfeiting activity and related business records. Accordingly, a seizure order without notice to [d]efendants is the sole and only means of insuring that additional evidence of counterfeiting activities will be procured and preserved."[47]

The court cannot agree. Given the evidence EPT has proffered, it has not made a sufficient showing that defendants *would destroy* the evidence sought to be seized if they were given notice of the seizure order. EPT has thus also failed to demonstrate that only an *ex parte* seizure order will achieve the purposes of § 1114. As with EPT's request for an *ex parte* TRO, the only "evidence" it proffers is a conclusory statement in Li's declaration:

"Defendants in this action can be similarly expected to divest themselves of their inventory of counterfeit merchandise and any relevant business records absent the issuance of the temporary restraining and seizure orders without notice which EPT has requested. Their activities, as attested to in the accompanying declaration of EPT's officer and Mr. Nguy, strongly suggest that Defendants will continue to engage in their counterfeiting activities. Confronted with the loss of their inventory and a substantial adverse judgment predicated upon the information contained in their business records, they cannot be expected to produce voluntarily their contraband merchandise and any business records documenting their illegal activities. If the temporary restraining and seizure orders are not granted, Defendants will have additional time to continue the distribution and sale of infringing merchandise thereby further irreparably harming and damaging Plaintiff's reputation and further eroding its interests and rights in the valuable Registered Marks."[48]

As the court has noted, EPT fails to adduce any evidence suggesting that defendants *would destroy* or otherwise dispose of relevant evidence if given notice. The court agrees with many other courts that have confronted similar circumstances – an attorney's conclusory assertion about the general propensity of counterfeiters to destroy counterfeit products does not constitute "*specific facts*" that "clearly"

---

[47]Memorandum at 12-13.

[48]Li Decl., ¶ 7.

demonstrate defendants would destroy evidence if given notice of a seizure order as required by § 1116(4)(B).  See, e.g., *Lorillard Tobacco Co. v. Bisan Food Corp.*, 377 F.3d 313, 320-21 (3d Cir. 2004) ("[The District Court] noted that 'Lorillard has failed to make the requisite showing that no other method of preserving a state of affairs on which a court can provide effective final relief exists.'  It observed that Lorillard could have put in direct evidence that the defendants had not complied with other court orders, and stated that, on the record before it, 'there is no showing of prior disobedience or evidence of destruction on the part of Edwin Liquor Store or its owner, its registered owner Anna Rodriguez.'  The District Court further suggested that Lorillard could have shown that the defendants were comparable to other retailers who had flouted court orders, but again observed that, on the record before it, Lorillard had not shown that 'other merchants with which Edwin Liquors might reasonably be [compared] have destroyed evidence in the past.' . . .  The record before the District Court in the cases now before us supports (though does not compel) the [conclusion that plaintiffs had not shown that evidence would be destroyed absent an *ex parte* order]: First, there is no evidence that these defendants have previously failed to appear in court when required; indeed, there has been no prior legal action at all against these defendants.  Second, there is not even the suggestion that small independent retailers with fixed places of business are as a class unlikely to comply with a court order.  Third, these defendants – incorporated businesses with inventories, assets, and a fixed physical presence – have much to lose if held in contempt.  Lorillard can point to no direct evidence in the record to the contrary.  Especially in light of the Act's emphatic command that the elements supporting *ex parte* seizure 'clearly appear[ ] from specific facts,' 15 U.S.C. § 1116(d)(4)(B), the District Court's factual findings were not clearly erroneous"); *Premier Sys. USA v. Ollo Elecs. LLC*, No. SACV 13-0601 DOC (ANx), 2013 U.S. Dist. LEXIS 59580, *10 (C.D. Cal. Apr. 17, 2013) ("Here, Plaintiff has failed to 'do more than assert that the adverse party would dispose of evidence,' and so cannot succeed in its attempt to secure a TRO without notice to Defendant.  Plaintiff argues that Defendant would 'destroy, move, hide, or otherwise make the infringing products inaccessible to the Court' if notice were provided.  However, Plaintiff's only support for this contention is that Defendant's 'blatant counterfeiting suggests that Defendant would likely destroy, hide, or otherwise make the infringing products inaccessible' if Plaintiff were to notify Defendant. . . .  Because Plaintiff fails to provide specific facts showing that it has met the requirements of 15 U.S.C. § 1116(d)(4)(B)(vii), the Court finds that a seizure order is not warranted.  In order to show that 'the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person,' Plaintiff only offers conclusory statements about the general propensity of counterfeiters to destroy or hide evidence.  As the Court discussed at length in the previous section of this Order denying an *ex parte* TRO, such a generalized assertion about the propensity of counterfeiters cannot be enough to justify the issuance of an *ex parte* injunction without notice to Defendant.  Other courts in this circuit agree that 'the mere allegation a defendant is engaged in criminal counterfeiting, and thus has an *incentive* to destroy evidence, without more, is insufficient to support granting an *ex parte* request for a seizure order.'  Accordingly, Plaintiff's request for an *ex parte* seizure order is DENIED" (citations omitted)); *Rovio*, 907 F.Supp.2d at 1098 ("[T]he Court finds that an *ex parte* seizure order is not warranted for the same reasons that an *ex parte* TRO is not warranted.  To the extent Plaintiff suggests that an *ex parte* seizure order is warranted because Defendants possess counterfeit goods, the Court rejects the suggestion.  The mere allegation that a defendant is engaged in counterfeiting, and thus has an incentive to destroy evidence, without more, is insufficient to support granting an *ex parte* request for a seizure order.  Were courts to hold otherwise,

*ex parte* seizure orders would become automatic in all counterfeiting cases. Accordingly, for the reasons stated above, Plaintiff's request for an *ex parte* seizure order is DENIED" (citations omitted)); *Dish Network L.L.C. v. Sonicview USA, Inc.*, No. 09-CV-1553 L (NLS), 2009 WL 2224596, *5 (S.D. Cal. July 23, 2009) ("According to Gee's declaration, Defendants use computers to conduct their piracy activities. Based on his years of experience with 'numerous piracy cases,' as well as the fact that piracy devices are small and highly portable, Gee opines that there is a real and substantial risk that Defendants will dispose of evidence once they receive notice of the proceedings. Although he offers no specifics, Gee further alleges that he has first-hand knowledge of destruction of evidence in similar cases. In order to obtain an *ex parte* TRO or seizure/impoundment order, Plaintiffs must demonstrate that notice to Defendants would render fruitless further prosecution of the action because Defendants would likely destroy evidence. *[Reno Air]*, 452 F.3d at 1131. In *[Reno Air]*, for example, plaintiffs contended that the TRO 'must issue without notice . . . because of the significant risk that Defendant' might leave the area and 'destroy or conceal [his] infringing merchandise once [he] receive[s] notice of the lawsuit.' *Id.* at 1132 (brackets in original). Supporting this claim was plaintiff's counsel's declaration, which stated that 'in his experience, this is a common occurrence when dealing with infringers at one time famous events such as the ["]Reno Air Races["] and it is well-recognized in the case law.' *Id.* The Ninth Circuit found the declaration insufficient: 'This conclusory statement from counsel hardly qualified as evidence and certainly did not link the TRO application to McCord.' *Id.* Here, Gee's declaration also falls short of making the requisite showing. Similar to counsel's declaration in *[Reno Air]*, Gee's declaration is made up of vague allegations regarding his years of experience with 'numerous piracy cases,' as well as generalizations regarding the propensities of satellite-television pirates. Gee offers no specific information regarding Defendants in this case that suggests that they are likely to disregard a court order, or that Defendants have a history of spoliation of evidence. Plaintiffs' requested relief, which includes a request to enjoin Defendants' manufacture and distribution of all satellite receivers or any other technologies related to or useful for satellite television, is overbroad and is therefore denied. Moreover, Plaintiffs offered no specifics suggesting that these Defendants are likely to destroy evidence despite a court order. Accordingly, they have not shown that *ex parte* relief is appropriate in this case. Plaintiffs' TRO and Seizure Motion for *ex parte* relief is therefore DENIED"); *Wangson*, 2008 WL 4239155 at *5 ("Wangson provides no support for its conclusion that defendants will 'undoubtedly' destroy evidence upon receiving notice of this suit, ostensibly suggesting that an *ex parte* seizure order should issue on the mere showing of a possible criminal possession of counterfeit goods. Courts have held, however, that the mere allegation a defendant is engaged in criminal counterfeiting, and thus has an *incentive* to destroy evidence, without more, is insufficient to support granting an *ex parte* request for a seizure order"); *Earth Products, Inc. v. Gordo Enterprises Inc.*, No. C05-1847C, 2005 WL 3007125, *1-2 (W.D. Wash. Nov. 9, 2005) ("Here, Plaintiff argues that the relief requested should be granted *ex parte* because 'history has shown that a defendant in a trademark counterfeiting case who is notified of the commencement of a lawsuit such as this one [ ] will invariably hide, destroy, or transfer to another party all of the counterfeit goods and any business records related thereto in the defendant's possession.' It is true that in passing the *ex parte* seizure provisions of the Lanham Act, Congress specifically remarked on the propensity of 'those who deal in counterfeits . . . to destroy or transfer counterfeit merchandise when a day in court is on the horizon. The *ex parte* seizure procedure is intended to thwart this bad faith tactic, while ensuring ample procedural protections for persons against whom such orders are issued.' 130 Cong. Rec. H12076 at 12080 (Oct. 10, 1984), quoted in 4 McCarthy on Trademarks § 30.16[2][b]. However, despite Congress's express intent

to thwart bad faith counterfeit defendants, the statute as enacted contains several safety devices which ensures that a plaintiff may not set the *ex parte* seizure procedure in motion at will.  The two most relevant of these devices in this case are subsections (i) and (vii), which together require a specific finding by the Court that *ex parte* relief is necessary because the defendant would otherwise attempt to destroy, move, hide, or otherwise hide the accused items. . . .  Most important, however, in light of the express language of 15 U.S.C. § 1116(d)(4)(B)(I) and (vii), is the absence of any particularized allegations that Defendants should be presumed to be of that class of merchants who would fail to comply with a court order.  For these reasons, the Court finds that it would be inappropriate to grant Plaintiff's motion for an *ex parte* seizure and impoundment order").

In so concluding, the court is cognizant of the limitations on a party's ability to obtain evidence regarding an alleged counterfeiter's activities or specific propensity to violate a court order and/or destroy evidence that the plaintiff seeks to have seized.  Difficulties in satisfying each of the requirements for an *ex parte* seizure order, however, serve to limit the provision's applicability which, as the Third Circuit noted in *Vuitton v. White*, 945 F.2d 569, 575 (3d Cir. 1991), was the result intended by Congress:

> "The legislative purpose behind § 1116(d) is clear from the Joint Statement of the congressional committees:
>> The purpose of the ex parte seizure provision is to provide victims of trademark counterfeiting with a means of ensuring that the courts are able to exercise their jurisdiction effectively in counterfeiting cases. Testimony before both the House and Senate Judiciary Committees established that many of those who deal in counterfeits make it a practice to destroy or transfer counterfeit merchandise when a day in court is on the horizon. The *ex parte* seizure procedure is intended to thwart this bad faith tactic, while ensuring ample procedural protections for persons against whom such orders are issued.  In essence, both the Senate and House bills permitted issuance of an *ex parte* seizure order if the applicant could show that the defendant would not comply with a lesser court order, such as a temporary restraining order, and that there was no means of protecting the court's authority other than to seize the property in question on an ex parte basis.  Joint Statement, 130 Cong.Rec. at H12080, reprinted in Gilson at 34–622.
>>
>> The legislative history thus indicates that Congress considered '*ex parte* seizures . . . a necessary tool to thwart the bad faith efforts of fly by night defendants to evade the jurisdiction of the court', Joint Statement, 130 Cong.Rec. at H120781, reprinted in Gilson at 34–625, and intended seizure orders to be available whenever a temporary restraining order and the threat of contempt for a violation thereof are unlikely to result in preservation of the evidence and the removal of the counterfeit merchandise from commerce."

In *Vuitton*, the Third Circuit held that the district court had erred in not entering an *ex parte* seizure

order because the plaintiff was battling street vendors who had previously dealt in counterfeit merchandise and who, faced with injunctions in related cases, had failed to appear in court and had failed to cease infringing activities. *Vuitton*, 945 F.2d at 570-71. Because "fly by night" defendants like the street vendors in *Vuitton* could easily destroy or conceal evidence if given notice, the Third Circuit concluded that an *ex parte* seizure order was warranted. *Id.* at 575-76.

Consistent with *Vuitton*, courts have entered *ex parte* seizure orders in situations where notice was likely to cause defendants to flee the jurisdiction with the allegedly counterfeit goods. See, e.g., *Hand & Nail Harmony, Inc. v. Guangzhou Cocome Cosmetics Co.*, No. 2:14-CV-01106 RFB CWH, 2014 U.S. Dist. LEXIS 102525, *11 (D. Nev. July 15, 2014) ("The Defendants offering the counterfeit goods do not appear to have any physical address in the United States or any connection to [any] business entity in the United States. The Defendants appear to be based in China and beyond the legal reach, generally, of Unites States' courts and their authority to impose meaningful remedies or sanctions for trademark infringement in this country. Moreover, even the addresses and identifying information for the Defendants in connection with sale of the counterfeit products at the booth at the Cosmoprof show is conflicting. Based upon these facts, the Court finds that an *ex parte* seizure order is necessary to prevent the Defendants from removing or hiding the counterfeit goods if given notice. The Court finds that it is likely that the Defendants would, upon notice, most likely simply return to China with the counterfeit goods and thus be able to reintroduce them from abroad into the market in this country"); *Otter Products, LLC v. Anke Group Indus. Ltd.*, No. 2:13-CV-00029 MMD-RJJ, 2013 WL 5910882, *3 (D. Nev. Jan. 8, 2013) ("An *ex parte* seizure is necessary to achieve the purposes of Section 32 of the Lanham Act, 15 U.S.C. § 1114, because (a) Anke is a China-based manufacturer of portable electronic devices; (b) with the exception of its temporary presence in Las Vegas for the CES tradeshow, Anke does not have any known regular place of business or assets in the United States; (c) there is significant risk that Anke will remove any evidence of its counterfeiting [to China] if an *ex parte* seizure order is not granted").

Here, based on the present record, there is no indication that defendants are such "fly by night" operators that an *ex parte* seizure order is required. Unlike the defendants in *Vuitton*, *Hand & Nail Harmony*, and *Otter*, defendants here are not street or trade show vendors; they have two physical retail locations that may well conduct legitimate business activities in addition to alleged counterfeiting. Courts have emphasized that caution should be exercised in granting an *ex parte* seizure order to take possession of inventory and other items at established businesses that engage in legitimate, as well as potentially unlawful, business activities. See, e.g., *Rovio*, 907 F.Supp.2d at 1098, n. 10 ("In *Lorillard*, the Third Circuit noted that 'incorporated businesses with inventories, assets, and a fixed physical presence – have much to lose if held in contempt.' *Lorillard*, 377 F.3d at 321. In contrast, itinerant street vendors with few assets have little to fear from the Court's contempt powers. *Id*. Here, the evidence before the Court indicates that Plaintiff seeks to seize the inventory of incorporated businesses with an inventory, assets, and a fixed physical presence. . . . *Ex parte* seizure orders against established ongoing businesses are disfavored"); *Wangson*, 2008 WL 4239155 at *5 ("Lastly, *ex parte* seizure orders against established ongoing businesses are disfavored. As the Third Circuit has noted, 'incorporated businesses with inventories, assets, and a fixed physical presence have much to lose if held in contempt," citing *Lorillard*, 377 F.3d at 321); *Earth Products, Inc.*, 2005 WL 3007125 at *2 ("[D]espite Congress's express intent to thwart bad faith counterfeit defendants, the statute as enacted

contains several safety devices which ensures that a plaintiff may not set the *ex parte* seizure procedure in motion at will. The two most relevant of these devices in this case are subsections (i) and (vii), which together require a specific finding by the Court that *ex parte* relief is necessary because the defendant would otherwise attempt to destroy, move, . . . or otherwise hide the accused items. Courts determining whether to enter *ex parte* seizure and impoundment orders have taken these two sections to heart. For example, in *Clorox Co. v. Inland Empire Wholesale Grocers, Inc.*, a court found that: '[i]t would not be appropriate to order [an *ex parte* ] seizure against a reputable merchant, absent unusual circumstances – such as when the applicant can make a particularized showing that the merchant would be likely to defy a court order to maintain the status quo. A reputable businessperson would not be likely to conceal or destroy evidence when notified of a pending lawsuit, and the issuance of an ex parte seizure order against such a person would therefore be wholly inappropriate, absent the unusual circumstances just mentioned. 874 F.Supp. 1065, 1069 (C.D. Cal. 1994) (quoting from *Gen. Elec. Co. v. Speicher*, 681 F.Supp. 1337, 1343 (N.D. Ind. 1988)). Here, Defendants have a bricks and mortar business address in addition to their websites. This business address also loosely corresponds to the location of the post office box to which Plaintiff has sent an invoice regarding legitimate sales to Defendants. . . . For these reasons, the Court finds that it would be inappropriate to grant Plaintiff's motion for an ex parte seizure and impoundment order").

Accordingly, the court concludes that EPT has failed to proffer *specific facts* from which it clearly appears that defendants will destroy the items EPT seeks to have seized. It has thus failed to demonstrate that an *ex parte* seizure order is its only means of relief under § 1114.

## b.     Conclusion Regarding § 1116(d)(4) Requirements

For the reasons stated, the court concludes that EPT has failed to proffer *specific facts* clearly demonstrating that defendants would destroy or otherwise make the items sought to be seized inaccessible if they were given notice of EPT's application for a seizure order. It has also failed to demonstrate that an *ex parte* seizure order is the only means of relief available to it. Because the requirements under § 1116(d)(4) are conjunctive, the court need not further consider whether EPT has made a sufficient showing to satisfy the requirements of § 1116(d)(4)(ii)-(vi).[49] The court therefore denies EPT's application for an *ex parte* seizure order.

## III.  CONCLUSION

For the reasons stated, the court denies EPT's application for an *ex parte* TRO and an order to

---

[49]The evidence proffered by EPT regarding the remaining § 1116(d)(4) requirements is similarly conclusory, however. *Ex parte* seizure orders, like *ex parte* TROs, are disfavored and narrowly construed, see *Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co.*, 112 F.3d 1296, 1306 (5th Cir. 1997) ("Given the draconian nature of this *ex parte* remedy, providing for the seizure of defendant's wares and records without prior notice to the defendant and with the assistance of law enforcement officers, we believe that it should be narrowly construed"), and EPT bears the burden of proffering *specific facts* that satisfy each requirement.

show cause regarding issuance of a preliminary injunction.  It also denies EPT's application for an *ex parte* seizure order.   Because EPT's application for these forms of relief have been denied, the court likewise denies its request that the complaint be filed under seal, and its application for expedited discovery.[50]

---

[50]The court is not issuing an *ex parte* seizure order under § 1116(d)(1)(A).   Hence, § 1116(d)(10)(b) provides no authority for expediting discovery.  See 15 U.S.C. § 1116(d)(10)(B) ("*In connection with a hearing under this paragraph*, the court may make such orders modifying the time limits for discovery under the Rules of Civil Procedure as may be necessary to prevent the frustration of the purposes of such hearing" (emphasis added)).   Nor does EPT demonstrate that issuance of such an order under Rules 26(f) and 34(b) of the Federal Rules of Civil Procedure is warranted.  EPT states only that expedited discovery is needed so it can "quickly" establish its entitlement to a preliminary injunction.  Because the court has declined to issue an order to show cause re preliminary injunction, EPT will have adequate time to conduct discovery before filing a regularly noticed motion for preliminary injunction.  The denial of this aspect of EPT's application, however, is without prejudice to its renewal if EPT can make an adequate showing of the need for expedited discovery on certain topics.